IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:18cr95-MHT |
| | ) | (WO) |
| MARTINEZA DEWAN McCALL | ) | |

## OPINION AND ORDER

This matter is before the court on defendant
Martineza Dewan McCall's emergency motion for
compassionate release pursuant to 18 U.S.C.
§ 3582(c)(1)(A). At an evidentiary hearing on June 3,
2020, the court heard from two Bureau of Prisons (BOP)
contract physicians as well as a sickle cell disease
expert. Because, based on this and other testimony, the
court concludes that McCall's particular circumstances
pose an urgent life-or-death situation that the BOP is
unable to address in the face of the COVID-19 outbreak
at the facility housing McCall, the motion will be
granted.

## I. BACKGROUND

McCall is serving a 10-year sentence for one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1). He has been incarcerated since March 2018. The prison where McCall is currently incarcerated, FCI Forrest City-Low, has been hit particularly hard by the COVID-19 pandemic, with approximately 578 out of 2,200 inmates testing positive as of June 3, 2020. *See* June 3, 2020, Hr'g Tr. Rough Draft (R.D.) at 6 (testimony of Bureau of Prisons physician Dr. Nwannew Obi).

In his initial motion, filed on April 27, McCall sought compassionate release due to his "unique susceptibility to COVID-19 given [his] Sickle Cell Disease diagnosis--which exposes him to heightened risks." *See* Motion for Compassionate Release (doc. no. 51) at 4-5. He argued that the increasing number of positive COVID-19 cases at Forrest City-Low, the inability to maintain social distance and proper hygiene

2

in the prison, and the dire--possibly fatal--risks posed to him by COVID-19 in light of his sickle cell disease constituted "extraordinary and compelling" circumstances warranting his release.

On May 20, McCall tested positive for COVID-19.  *See* Defense Brief (doc. no. 75).  He continued to argue that he should be released in light of the failure of the BOP to provide adequate and specialized medical care despite his heightened vulnerability and his worsening medical condition.  He argued that the BOP lacks sufficient resources to treat the explosion of COVID-19 cases at Forrest City-Low and that a dearth of medical resources in the surrounding area, particularly of specialized care for sickle cell disease, "reduces the likelihood he would have access to the necessary medical equipment and personnel in the event of an emergency."  Defense Brief (doc. no. 81) at 2.

As stated, on June 3, the court held a hearing and heard from two BOP contract physicians and a sickle cell

disease expert.  While the court will, later in this opinion, provide a more detailed summary of the evidence, the ultimate critical factual conclusions are that McCall's circumstances have changed dramatically since he filed his motion.  His condition has grown much worse; he is suffering from severe pains throughout his body, and recently had chest pains and difficulty breathing; and, despite this condition, the BOP medical staff still views him as asymptomatic for COVID-19 and houses and treats him as an asymptomatic inmate with minimal follow-up care.

However, contrary to the diagnosis of the BOP medical staff (who have no special expertise with regard to sickle cell disease), the virtually uncontested evidence at the June 3 hearing, with regard to the treatment of sickle cell disease in conjunction with COVID-19, reflects that McCall is, in fact, not only symptomatic for COVID-19, his condition is life-threatening, and he should be hospitalized *now*.  Further, the BOP medical

4

staff, in the midst of the COVID-19 outbreak at Forrest City-Low, has taken very little action, and continues to fail to take critical action, to treat his life-threatening condition.  The BOP medical staff also has no plan in place whatsoever to provide the follow-up care he needs as a symptomatic COVID-19 patient with sickle cell disease.  Finally, should McCall make a remarkable recovery despite this lack of necessary treatment, the BOP also has no plan in place to protect him from reinfection, which the sickle cell expert opined is a serious concern.  In view of the severe, and possibly fatal, symptoms which McCall is suffering as a result of his current infection, the risk of his reinfection is unacceptable.

## II. LEGAL FRAMEWORK

McCall seeks compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), which authorizes a court to

modify a term of imprisonment in certain enumerated circumstances.  As relevant here, it states:

> "[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) *extraordinary and compelling* reasons warrant such a reduction ...
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

18 U.S.C. § 3582(c)(1)(A) (emphasis added).

Congress has never defined "extraordinary and compelling" in the compassionate release context and instead directed the United States Sentencing Commission to describe which circumstances qualify.  *See* 28 U.S.C.

6

§ 994(t).  The "applicable policy statement" with which relief under § 3582(c)(1)(A) must be consistent is U.S.S.G. § 1B1.13 cmt. n.1.  In that policy statement, the Sentencing Commission provides three types of specific circumstances that would entitle a defendant to relief: (A) a medical condition of the defendant substantially reduces his ability to provide self-care in prison, (B) the advanced age of the defendant, and (C) the defendant's family circumstances.  In apparent acknowledgment that the three enumerated circumstances would not capture all situations where compassionate release is appropriate, the Commission also included a 'catchall' provision where the Director of the BOP finds "other reasons" exist that are "extraordinary and compelling."  U.S.S.G. § 1B1.13 cmt. n.1(D).

Prior to the First Step Act of 2018, Pub. L. No. 115-391, only upon motion of the BOP could a court consider releasing a defendant under 18 U.S.C. § 3582(c)(1)(A).  Now, prisoners may file their own

7

motions without the BOP's support provided that they have either "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [their] behalf" or 30 days have lapsed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).

### III. Discussion

#### A. "Extraordinary and Compelling Reasons"

##### i.  Legal Authority

The court may reduce McCall's sentence only if it finds "extraordinary and compelling reasons" warrant his release.  18 U.S.C. 3582(c)(1)(A).[1]  Although the catchall provision (D) of the Sentencing Commission's policy

---

1. Because the government has conceded that McCall has exhausted his administrative remedies, *see* June 3, 2020, Hr'g Tr. Rough Draft (R.D.) at 127-28, the court turns straight to the merits of McCall's motion.

8

statement, U.S.S.G. § 1B1.13 cmt. n.1, gives authority

to the BOP, not to the court, to determine whether reasons

other than those enumerated warrant release, this policy

guidance has not been updated since the passage of the

First Step Act in December 2018, Pub. L. No. 115-391.

This court joins many others around the country in

finding that, with regard to any inconsistency between

the statute and the policy statement, the policy

statement serves as guidance, but does not limit the

court's authority.[2]  In light of its aim to increase the

_____

    2.  *See* *e.g.* *United* *States* *v.* *Ullings*, No.
1:10-CR-406, 2020 WL 2394096, at *2 (N.D. Ga. May 12,
2020) (Brown, J.) ("section 1B1.13 provides helpful
guidance but does not constrain the issues a court may
consider in assessing whether a defendant's application
for compassionate release provides 'extraordinary and
compelling reasons' for a sentence reduction under
§ 3582(c)(1)"); *United* *States* *v.* *Maumau*, 2:08-CR-758,
2020 WL 806121, at *4 (D. Utah Feb. 18, 2020) (Campbell,
J.) ("Under the First Step Act, it is for the court, not
the Director of the Bureau of Prisons, to determine
whether there is an 'extraordinary and compelling reason'
to reduce a sentence"); *United* *States* *v.* *Redd*, 1:97-CR-
6, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020)
(Trenga, J.) ("restricting the Court to those reasons set
forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C), as the

number of motions heard by the court by removing the BOP as the sole gatekeeper to compassionate release, it would be contrary to Congress's intent to find the court constrained in its ability to evaluate a motion under the full range of possible "extraordinary and compelling" circumstances. As the Sentencing Commission itself

---

Government proposes, would effectively preserve to a large extent the BOP's role as the exclusive gatekeeper, which the First Step Act substantially eliminated"); *United States v. Rodriguez*, 2:03-CR-00271, 2020 WL 1627331, at *4 (E.D. Pa. Apr. 1, 2020) (Brody, J.) ("the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions . . . . Therefore, the policy statement may provide 'helpful guidance' but does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)"); *United States v. Cantu-Rivera*, No. 89-CR-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) (Lake, J.) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect.") (internal citation omitted); *United States v. Brown*, 2:18-CR-360 (N.D. Ala. May 21, 2020) (Bowdre, J.) (finding deteriorating medical condition after positive COVID-19 diagnosis and risk of inadequate medical care constituted "extraordinary and compelling" circumstances).

states, "the court is in a unique position to determine
whether the circumstances warrant a reduction (and, if
so, the amount of reduction), after considering the
factors set forth in 18 U.S.C. § 3553(a) and the criteria
set forth in this policy statement." U.S.S.G. § 1B1.13
cmt. n.4.  The court finds such circumstances exist in
McCall's case.

### ii. Medical Condition and Care

As stated, on June 3, 2020, the court held an
evidentiary hearing on McCall's motion for compassionate
release.[3]  At the hearing, the court heard testimony from
BOP contract physicians Dr. Hari Kapur and Dr. Nwannew
Obi as well as sickle cell disease expert Dr. Nirmish
Shah, who is an Assistant Professor of Medicine and
Director of the Sickle Cell Disease Transition Program

---

3. Because of the COVID-19 pandemic, the hearing was
held by videoconferencing.

at Duke University.  The court also heard testimony from
McCall himself.

As discussed, McCall initially sought release to
prevent his exposure to COVID-19 in light of his sickle
cell disease.  The court need not decide whether McCall's
circumstances at the time of his motion, namely his
unique vulnerability and the risk of his contracting
COVID-19, were "extraordinary and compelling" because,
as stated, his circumstances changed dramatically when
he tested positive for COVID-19.  *See* Defense Brief (doc.
no. 75).  It is now not merely hypothetical whether McCall
will contract COVID-19 and how, because of his sickle
cell disease, he will react to the virus.  Unfortunately,
he has contracted the virus and is now experiencing
considerable pain throughout his body; in addition, he
recently suffered chest pain and had difficulty
breathing.  During the June 3 hearing and when he spoke
with Dr. Shah two days prior, he rated this pain as a

12

level eight out of ten. *See* June 3, 2020, Hr'g Tr. R.D. at 70, 113.

Sickle cell disease expert Dr. Shah explained that sickle cell disease patients exhibit some COVID-19 symptoms different from those of the general population. While the classic symptoms of COVID-19 include cough, fever, and respiratory symptoms, approximately 60 to 65 % of COVID-19 patients with sickle cell disease report pain. *See* June 3, 2020, Hr'g Tr. R.D. at 65. According to Dr. Shah, McCall's recent pain is especially likely to be due to his COVID-19 infection because he ordinarily experiences no pain from his sickle cell disease. *See id.* at 70. Distressingly, however, BOP physicians Dr. Obi and Dr. Kapur repeatedly characterized McCall as "asymptomatic" of COVID-19 and reported that he is housed in a large dorm intended for infected, but asymptomatic inmates. *See* id. at 30, 31.

In light of McCall's sickle cell diagnosis and his current COVID-19 symptoms, Dr. Shah identified three

13

critical components to providing McCall with care: (1)
immediate care for his current symptoms, (2) close
follow-up and immediate care should his condition worsen,
and (3) protection from future re-infection with
COVID-19.[4]  The court finds the BOP completely unequipped
with regard to all three components and that the fatal
risk posed to McCall if he does not receive this necessary
care constitutes an "extraordinary and compelling" reason
to order his release.  The court will discuss its concerns
with regard to each component in turn.

*Immediate care for current symptoms*: First, Dr. Shah
credibly opined that pain in sickle cell patients,
particularly those with COVID-19, is "absolutely" a
symptom that must be managed because of the fatal
complications to which it can lead.  *See* June 3, 2020,
Hr'g Tr. Rough Draft (R.D.) at 65, 83.  Pain, including

---

    4. In addition to his expertise in sickle cell
disease, Dr. Shah based his testimony on his evaluation
of McCall by phone and review of the records of McCall's
care and testing at the BOP on May 27, 28, and 29.

in the extremities, can cause sickle cell patients not to take full breaths, which reduces the expansion of the lungs and can cause parts of the lungs to collapse. *See id.* at 65-66. This can ultimately lead to 'acute chest'--the leading cause of death for sickle cell patients. *See id.*

Addressing pain promptly is critical, according to Dr. Shah, both because of the risk of it leading to a suddenly emergent condition, and also because "the length of time and the degree of pain both increase your likelihood [of complications]." *Id.* at 82. The serious risk of developing a fatal complication exists as long as a patient is experiencing sickle cell-related pain, even if initial blood tests and x-rays appear normal. *See id.* at 72, 85. According to Dr. Shah, appropriate treatment for severe sickle cell-related pain includes strong pain medication, like oxycodone or Percocet, with more aggressive measures indicated, including

hospitalization for intravenous pain medication or blood transfusions, if the pain persists. *See id.* at 76, 83.

McCall has been experiencing pain since approximately the time of his COVID-19 test on May 14--now three weeks ago. *See id.* at 82. Dr. Shah credibly opined that McCall should have already been admitted to the hospital to receive treatment for this pain such that his condition would have improved by now. *See id.* at 84. The evidence shows that McCall continues to face life-threatening risks without this necessary pain management.

Moreover, it appears that, absent the court's involvement, McCall likely would not have received *any* specialized care at all from the BOP since he tested positive for COVID-19, much less hospitalization to address his pain. On May 22, upon learning of his COVID-19 diagnosis, the court ordered the government to look into the status of McCall's treatment, including the possibility of his receiving specialized care. *See* May

16

22, 2020, Status Conf. Tr. R.D. at 16.  Specifically, the
court ordered the government to "see if he can be examined
by either a hematologist or a department with a
hematologist" and to have him evaluated in accordance
with the recommendations of McCall's sickle cell disease
experts.  *Id.*  The recommendations to which the court
referred were made by Dr. Shah and Dr. Julie Kanter, a
sickle cell disease specialist at the University of
Alabama-Birmingham, and included that, in addition to
other specialized follow-up care, McCall "should be seen
immediately at a hospital, where he should be evaluated
by a medical professional--including bloodwork to assess
his oxygen levels, X-rays, and a pain assessment."
Defense Brief (doc. no. 79) at 2.  The experts'
recommendations further included that the hospital
"should have access to a hematology department to consult
regarding specific complications."  *Id.*  The government
responded to the court's order the same day stating that
BOP physicians "will be giving McCall a full workup as

17

soon as possible, as prescribed by the defense's experts." *See* Government Brief (doc. no. 78). In response to McCall's representations on May 26 that he still had not been evaluated by any medical professional, *see* Defense Brief (doc. no. 79), the court, on May 27, ordered the government to inform the court whether McCall had been evaluated in the manner prescribed by his experts and the results of that evaluation. *See* Order (doc. no. 80). McCall was finally evaluated on May 28 for the first time since his COVID-19 diagnosis. It appears that this evaluation was done only as a belated response to the court's inquiries; for, as Dr. Obi confirmed, if a chronic care patient--like McCall--tests positive for COVID-19 but is deemed asymptomatic, the BOP conducts no medical evaluation of that patient beyond daily temperature checks. *See id.* at 24.

    To be sure, McCall was sent to the local hospital on June 1 in response to his report to a correctional officer of shortness of breath and chest pain. However, this

18

treatment does not detract from the fact that the BOP medical staff was still failing to recognize and treat his life-threatening COVID-19 symptoms.  Moreover, it cannot be overlooked that, even after the court's order on May 22, McCall was not evaluated by Dr. Kapur until May 28--a full 10 days after the BOP learned of his positive COVID-19 test.  The BOP has conducted no follow-up specifically as to his pain symptoms and never had him evaluated by a hematologist, as recommended by the sickle cell experts.  Even when provided with the experts' information about exactly what treatment was required, the BOP still failed to provide the necessary treatment.  If the BOP had consulted with a hematologist, the physicians would have realized McCall's pain was in fact a serious symptom of COVID-19.

The court cannot ignore the life-threatening nature of McCall's pain symptoms, which continue to go essentially untreated.  Dr. Shah made clear that, in his opinion, McCall is long overdue for admission to a

hospital to address his pain and the increasing risk to his overall health, and that he must be hospitalized for his condition *now*. *See id.* at 84.

*Follow-up care*: Second, Dr. Shah credibly opined that, for a patient like McCall who has sickle cell disease, "as long as he's known to be positive and his pain is still there, he needs to be assessed daily." *See* June 3, 2020, Hr'g Tr. R.D. at 75. Though taking an x-ray, as McCall received on May 28, was an appropriate initial course of action, doctors must continue, even after x-ray results are normal, to monitor a sickle cell patient closely. *See id.* at 72. The condition of sickle cell disease patients can "go in the wrong direction very quickly" with "no acute chest [shown on the x-ray] on day one, and on day two they have an acute x-ray." *Id.* at 72. Dr. Shah has had "many patients who are young that within hours can go from looking perfect, having discussions with you, to being intubated." *Id.* at 87. The rapid decompensation of a sickle cell patient's

20

condition makes close monitoring and swift medical intervention critical.  Consultation by a hematologist is another important aspect of follow-up care for sickle cell patients, including because of the lack of knowledge about the disease among even competent general care providers.  *See id.* at 61, 100.  The importance of hematology consultation is even greater when treating sickle cell patients with COVID-19 in light of the "unique" and "difficult" complications that can be caused by the combination of both diseases.  *See id.* at 91.

Even for COVID-19 patients without sickle cell disease, close monitoring for a rapid decline in condition appears to be critical.  Indeed, one inmate has already died in the BOP's custody just days after it deemed him "recovered" from the virus.  *See* Exhibit 3, BOP Press Release on Death of Adrian Solarzano, Defense Brief (doc. no. 89).  Despite this tragic case, the BOP does not appear to have changed its guidance to its physicians regarding the continued danger to COVID-19

patients even after apparent recovery.  *See* June 3, 2020, Hr'g Tr. R.D. at 37.

As discussed, McCall's pain has not responded to the ibuprofen he has been provided and he has not received any follow-up care regarding his COVID-19 symptoms.  In fact, the BOP has no plans for a follow-up appointment with a physician for McCall until his next chronic care appointment in February 2021.  *See id.* at 45.  The monitoring of McCall's condition consists of daily rounds by medical staff who check only the temperatures of approximately 155 inmates in his dorm.[5]  The BOP appears to have limited resources for monitoring patients: though there are also lower-level medical staff, Dr. Obi

---

5. The BOP physicians also testified that medical staff inquire when they do these rounds as to whether each inmate is experiencing the typical symptoms of COVID-19.  However, McCall credibly testified that the staff do not ask any questions and simply take each inmate's temperature.  In any case, the questions BOP physicians stated are asked of each inmate are still not directed at detecting symptoms unique to sickle cell patients with COVID-19.

testified that she and Dr. Kapur are the only doctors at Forrest City-Low, which houses 2,200 inmates, approximately 900 of whom are chronic care patients and 578 of whom are currently positive for COVID-19. *See id.* at 6, 9.  Dr. Obi contended that inmates may report symptoms at any time via a "sick call slip," *see id.* at 22; however, McCall credibly testified that he had been unable to report his ongoing pain symptoms to medical staff because he could not access a 'sick call slip' in his housing unit. *See id.* at 116.  It is clear that the BOP is not monitoring McCall any more closely than it is any 'asymptomatic' inmate, despite his underlying sickle cell disease and his repeated reports of pain.

The court finds the BOP's plan to monitor McCall's unique and precarious condition--which is essentially no plan at all--gravely inadequate.  The failure to follow-up on McCall's condition and provide immediate care if his condition suddenly declines could likely prove fatal.

*Protection from reinfection*: Finally, the evidence reflects that sickle cell patients who have already exhibited life-threatening symptoms of the virus must be protected from the risk of future reinfection.  Dr. Shah testified that he "would definitely not" put a sickle cell patient who was positive for COVID-19 in an open ward of a hospital with other COVID-19 patients and would instead want that patient to be isolated to prevent the possibility of reinfection.  *Id.* at 125.  Although the risk of reinfection after recovery from the virus is somewhat unknown, Dr. Shah stated that he would not want to take that risk for a sickle cell patient in light of the heightened risk of severe illness, and even death, such patients face.  *See id.* at 125.

McCall is currently 'quarantined' in a dorm of approximately 155 inmates, all of whom have tested positive for COVID-19.  *See id.* at 112.  BOP physician Dr. Kapur stated that he had no opinion about the BOP's protocol of 'quarantining' infected inmates together, and

24

Dr. Obi simply responded that the risk of transmission between inmates who have tested positive is unknown. *See id.* 126. Meanwhile, Forrest City-Low's current explosion of cases demonstrates its inability to manage an outbreak of the disease. BOP physician Dr. Obi testified that there are currently 578 inmates at the prison who are positive for COVID-19, *see id.* at 6, more than 12 times the number of positive cases at the prison when McCall filed the instant motion on April 17. *See* Motion for Compassionate Release (doc. no. 51) at 1. To be sure, the number of reported cases has likely increased in part due to increased testing. However, if McCall's case is an example of the BOP's management of COVID-19, there are additional explanations for the explosion of cases at the prison. Though McCall's COVID-19 diagnosis was entered into the medical staff's records on May 17, he remained in his general population dorm until May 20. *See* June 3, 2020, Hr'g Tr. R.D. at 34-35. BOP physicians Dr. Obi and Dr. Kapur appeared unconcerned about this delay

25

despite both doctors' acknowledgment that even asymptomatic COVID-19 patients are contagious. *See id.* at 35-36.

Even if McCall were lucky enough to fully recover at the BOP from his current COVID-19 infection, the evidence reflects that he would not be protected from the possibility of future reinfection. The court does not opine as to whether the risk of reinfection is unacceptably dangerous for all BOP inmates with heightened vulnerabilities, or even for all BOP inmates with sickle cell disease. It is the evidence the court already has of McCall's unique and life-threatening response to COVID-19 that makes the risk of his reinfection unacceptable.[6]

---

6. As an alternative ground for relief, the court finds that McCall's circumstances also qualify as "extraordinary and compelling" under U.S.S.G. §1B1.13 cmt. n.1(A). Provision (A) states that circumstances are "extraordinary and compelling" due to a defendant's medical condition including where the defendant is "suffering from a serious physical or medical condition ... that substantially diminishes the ability of the

defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." McCall's sickle cell disease is a lifelong condition from which he will not recover and which will continue to heighten his vulnerability to COVID-19 even upon recovery from his current infection. Meanwhile, in light of the outbreak at Forrest City-Low, the limited resources of the BOP, and the impossibility of social distancing in a correctional environment, McCall will be unable to provide the self-care of social distancing to protect himself from reinfection. *See United States v. Perez*, No. 17-CR-513-3, 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020) ("Perez cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus") (Torres, J.). The government has already conceded that the threat of COVID-19 for a prisoner with heightened vulnerability due to a chronic medical condition may be enough to grant relief under (A):

> "That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A). If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of 'extraordinary and compelling reasons.' Under these circumstances, a chronic condition (i.e ., one 'from which [the defendant] is not expected to recover') reasonably may be found to be 'serious' and to 'substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility,' even if that condition would not have constituted an 'extraordinary and compelling

The court finds that the failure of the BOP to correctly diagnose, monitor, and treat McCall's now life-threatening condition; the overwhelming number of COVID-19 cases at Forrest City-Low; and the overall inadequate resources at Forrest City-Low to treat McCall's condition while it manages its COVID-19 outbreak, in combination, constitute "extraordinary and compelling" circumstances that warrant McCall's release. The risk is simply too great that the BOP will fail to detect a decline in McCall's condition and, if his condition suddenly becomes even more emergent than it currently is, that the BOP will fail to provide him the specialized care he needs.   The court will not play Russian roulette with McCall's life.


B. Section 3553(a) Factors

---

reason' absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1(A)(ii)(I)."

Gov't Brief (doc. no. 60) at 17.

18 U.S.C. § 3582(c)(1) requires that a court consider the 18 U.S.C. § 3553(a) sentencing factors when deciding whether to grant a motion for compassionate release.  A review of these factors supports McCall's release.

First, the history and characteristics of the defendant support release.  See 18 U.S.C. § 3553(a)(1). At the time of sentencing, the court found significant mitigating factors present in McCall's case.  First, as the court noted at that time, McCall has suffered since birth from sickle cell disease, "which has caused weeks of bed-ridden debilitation, and was diagnosed with sciatica caused by a painful degenerative hip injury." Opinion (doc. no. 45) at 3.  Though McCall applied for disability benefits, his application was denied for lack of adequate documentation.  *See id.*  McCall's decision to sell drugs to pay his bills was one he may not have made absent his serious health issues.  McCall also suffers from post-traumatic stress disorder (PTSD)

stemming from the murders of two of his brothers--one which occurred in his presence. *Id.* at 4.

McCall's criminal history, a level II under the Sentencing Guidelines, includes no violent convictions. He has been designated to a low security prison by the BOP. While in prison, McCall has received no disciplinary infractions and has taken advantage of many rehabilitative opportunities. *See* Summary Reentry Plan, Exhibit 5, Defense Brief (doc. no. 89-5). In addition to working as a janitor, he has "completed numerous treatment and educational programs, such as drug treatment, diabetes awareness, financial investment, entrepreneurship, motivational thinking, interviewing skills, time management, accounting, janitorial services, parenting, creative writing, stress management, and black history." Motion for Compassionate Release (doc. no. 51) at 27; *see also* Summary Reentry Plan, Exhibit 5, Defense Brief (doc. no. 89-5); *see also* 18 U.S.C. § 3553(a)(2)(C).

Upon initial review of his motion, the court was concerned that McCall was originally sentenced to 10 years and has only served two years and a few months of that sentence. His sentence consists of a five-year mandatory minimum for his conviction under 21 U.S.C. § 841(a)(1) as well as an additional mandatory five-year enhancement under 21 U.S.C. § 841(b)(1)(b) due to the government's notice of information of McCall's two prior felony drug convictions, *see* 21 U.S.C. § 851. Although they qualified McCall for the enhancement, the convictions were fairly remote, and he had received short sentences for each. At the time of sentencing in this case, the court stated on the record that, absent the mandatory five-year enhancement, the court "would have given him a sentence of probably between 60 and 63 months." Sept. 18, 2018 Sentencing Tr. (doc. no. 47) at 17. Had the court done so, McCall would be nearly halfway through his sentence today. *See* 18 U.S.C. § 3553(a)(2)(A). In fact, the U.S. Probation Department

orally informed the court that, with a 60-month sentence and 'good time' credits, McCall would have been released to a halfway house as early as December 2021.

Just three months after McCall's sentencing, Congress passed the First Step Act of 2018, Pub. L. No. 115-391, § 401, which amended the five-year prior conviction enhancement to apply only where a defendant has a prior "serious drug felony" for which he served at least one year of incarceration, 21 U.S.C. § 802(57)(A). According to the Presentence Report (doc. no. 42), it does not appear that McCall served one year on either of his relevant prior convictions.  Thus, if McCall's sentencing had occurred after the First Step Act passed, McCall would have been subject to only a five-year mandatory minimum sentence and the court would have sentenced him to the minimum term or just above.  *See* First Step Act of 2018, Pub. L. No. 115-391, § 401(c) (amendments made by the Act "shall apply to any offense that was committed before the date of enactment of this

32

Act, if a sentence for the offense has not been imposed
as of such date of enactment"). The court considers in
its decision today Congress's changed view of the
appropriate sentence for McCall's conviction,
particularly in light of the pure happenstance that
McCall was sentenced prior to the change.[7] *See* 18 U.S.C.
§ 3553(a)(2)(A).

---

7. This court is far from the first to consider
changes to sentencing laws a relevant factor when
evaluating a motion for compassionate release. *See e.g.*
*United States v. Hope,* No. 90-CR-6108, 2020 WL 2477523,
at *4 (S.D. Fla. Apr. 10, 2020) (Williams, J.) (granting
compassionate release to defendant sentenced to life
imprisonment in light of medical concerns, rehabilitative
efforts, and changes to § 851 enhancements under First
Step Act); *United States v. Cantu-Rivera*, No. 89-CR-204,
2019 WL 2578272, at *2 (S.D. Tex. June 24, 2019) (Lake,
J.) ("Finally, the Court recognizes as a factor in this
combination the fundamental change to sentencing policy
carried out in the First Step Act's elimination of life
imprisonment as a mandatory sentence solely by reason of
a defendant's prior convictions"); *United States v.*
*Barrenechea*, 3:92-CR-0403, 2020 WL 2315638, at *1 (N.D.
Cal. May 7, 2020) (Chesney, J.) (considering as one
factor in the totality of circumstances warranting
release that the defendant would have received a lesser
sentence after passage of the First Step Act).

In evaluating the § 3553(a) factors, the court must pay particular attention to the demands of Congress and the government that McCall be punishment adequately for his crime. That interest must be balanced, however, against the grave risk that continuing to incarcerate McCall at the BOP may well be a death sentence. To approximate the five-year sentence McCall would have received had he been sentenced just three months later, the court will place McCall on home confinement with electronic monitoring for the next three years, followed by five years of supervised release. Throughout this period, the court will not hesitate to revoke McCall's supervised release should he violate the court's conditions.

Upon his release from prison, the court finds McCall will have substantial community support to help him access necessary medical care and comply with the conditions of supervised release, including from his mother, sister, and children. He plans to live with his

34

sister, who will pick him up from Forrest City-Low and take him directly to the Emergency Department at Methodist Hospital in Memphis, Tennessee, which has a Sickle Cell Disease program. Upon discharge from Methodist Hospital, McCall will quarantine in isolation at his sister's home and receive follow-up treatment coordinated by sickle cell specialist Dr. Julie Kanter at the University of Alabama-Birmingham.

## IV. CONCLUSION

After considering all relevant factors and the Sentencing Commission's policy statement, the court finds "extraordinary and compelling reasons" exist in McCall's case to reduce his sentence to time served. However, his release will not be without significant and restrictive conditions, including an additional three years of home confinement and five years of supervised release.

* * *

Accordingly, it is ORDERED that defendant Martineza Dewan McCall's motion for compassionate release (doc. no. 51) is granted as set forth above.  A separate judgment will be entered.

DONE, this the 4th day of June, 2020.

<u>    /s/ Myron H. Thompson    </u>
**UNITED STATES DISTRICT JUDGE**